NOT DESIGNATED FOR PUBLICATION

No. 126,858

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of S.P.,
*Appellee*,

and

R.P.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ford District Court; LAURA H. LEWIS, judge. Submitted without oral argument. Opinion filed August 16, 2024. Affirmed.

*Derek W. Miller*, of Miller & French, LLC, of Liberal, for appellant.

*Sunny A. Schroeder*, of Curtis E. Campbell, Chrtd., of Cimarron, for appellee.

Before HILL, P.J., ATCHESON and CLINE, JJ.

PER CURIAM: Modern divorce courts spring from the old courts of equity where the judges were guided by one principle: try to do what is right and fair under the circumstances. Modern divorce courts, awarding custody and dividing debts and property between two sparring marriage partners, still try to do what is right and fair under the circumstances. We must answer in this appeal whether the district court did what was right and fair under the circumstances.

1

*The parties meet, marry, and then move apart.*

S.P. (Father) and R.P. (Mother) married in 2017. They separated in 2022. The parties have one son, H.P., who was born in 2016. After separating, Father filed for divorce, claiming incompatibility. He also asked for the temporary custody of H.P. as well as child support from Mother. Mother answered the petition for divorce and filed a counter-petition for divorce. She asked for sole custody of H.P., that Father be limited to supervised visitation with H.P., and that he pay temporary child support.

*Mother and Father presented evidence and testimony at a bench trial.*

The record reveals tremendous conflict and animosity between Mother and Father. Father presented evidence and testimony from himself and Sheriff John Ketron. Mother also presented evidence and testimony from herself, as well as a nurse practitioner, the Director of H.P.'s daycare, H.P.'s therapist, and a neighbor. The evidence showed unequivocally that both parents struggled to communicate and cooperate with each other when rearing their son.

The parties submitted evidence of various instances where one party claimed neglect or abuse of H.P. by the other parent. These exhibits included photographs of various marks on H.P. or on Mother. She claimed these marks were the result of domestic violence by Father. Some photographs were sealed by the court because of the nature of the contents.

At the end of evidence, the trial court went through each factor under the statute governing custody and residency for minor children. The trial court concluded that joint legal custody was in H.P.'s best interests. Accordingly, the trial court adopted a shared custody plan where the parents are to exchange H.P. weekly. The court did not designate

a residential custodian. The parenting plan ordered that the parties are to alternate weekly physical custody of H.P. every Thursday.

The trial court also ordered custody exchanges to occur at H.P.'s school when he's in school. When H.P. is not in school, the exchanges were to occur at the Clark County Sheriff's Department for Mother's time and the Meade County Sheriff's department for Father's time. The trial court stated that the reason for the exchange location was that it was the fairest way to resolve the current issues involving exchanges because the court did not "trust the two [parents] to go to each other's households and not have some kind of an incident that law enforcement has to get called to, anyway. So, this way, we're not wasting their resources."

In addition to finding the parties incompatible and in need of a divorce, the court summarized the factors that influenced its decision to order joint legal custody of the parties' son. The trial court ordered that Mother cease taking compromising photographs of H.P. Mother was not allowed to move to Oklahoma with H.P. Father was required to contact H.P.'s doctors and therapist and ensure that he was listed on H.P.'s records and able to obtain information from the individual healthcare providers.

*The court tried to be fair in its equitable division of property and debts.*

Mother and Father owned several tracts of real estate in Ashland, Kansas, and some land in Oklahoma. The parties' main residence during their marriage was in Ashland, Kansas. After the filing of the divorce, only Mother resided at that residence; Father resided in Fowler, Kansas. The parties agreed on the division of several pieces of personal property and real estate, but there were remaining issues the parties could not agree on.

The court observed that there was a vast difference in the parties' net worth after the division of property and debt. Father received property with an estimated value of $8,500. Mother received property value estimated to be worth $125,787. To make a division which was fair, just, and equitable under the law, the court found that an equity payment was needed. But Father testified at trial that he did not want any monetary equity payment—he "just wanted the court to order that [Mother] be responsible for all debts she caused to be acquired on joint assets that had previously no debt or had debt that had been paid off already."

*The court heard claims of fraud.*

Father testified at trial that while the divorce action was pending, he obtained his credit report and found reports of several credit cards that he had known nothing about. He also testified that Mother purchased a shed through Premiere Buildings in his name and took out multiple credit cards without his knowledge or consent. Father testified that he reported these fraudulent credit cards to Meade County Sheriff's Office and gave a voluntary statement. As a result, Father stated that two of the credit cards were found to be fraud and taken off his credit report. Because he claimed that he neither had knowledge of nor consented to take out credit cards in his name, Father asked the court to not order him to pay those debts.

Mother disputed Father's fraud claims. She testified that she did not forge Father's signature on any of the credit cards or loans. She also testified that Father had promised to pay the back taxes listed under her side of the debt list. Because of this, she thought the back taxes were paid. Mother also claimed that Father never contributed towards the household financially, testifying that she paid for all utilities, provided transportation for their son, bought all groceries, and paid H.P.'s medical bills.

4

In response, Father disputed Mother's testimony that he never contributed to household finances. He claimed that he did not have a checking account but would use his paychecks to pay for things such as vehicle expenses—insurance and payments— as well as the livestock bills, some utilities, and various things for Mother. Father also testified that both he and Mother shared the responsibility of buying groceries and that Mother basically took care of anything that she wanted on her own.

*The court divided the debts and assets.*

In the written order on the final division of property and debts, the trial court noted the list of factors on which a court should rely when dividing marital property and debts. K.S.A. 23-2801; K.S.A. 23-2802. The court also noted:

> "[the]somewhat unique set of circumstances due to the fact that the parties own several pieces of real estate that do have monetary value, but have not provided the Court a clear picture as to where some of the property is located, how it was acquired and what value they are proposing be assessed to it."

Then, the trial court listed the assets and debts assigned to each party to:

> "balance the necessity of making a fair, just and equitable division of property and debts that were acquired during the marriage by the parties with full consent of both parties, but also consider whether there is evidence to support fraud on the part of [Mother] in adding to the parties joint debt during the pendency of the divorce proceedings."

The trial court then found that "due to the fact that the Court is awarding [Mother] several items of real property both in Kansas and Oklahoma, she has significant resources that she should be able to either use as a collateral to refinance debt into her individual name and remove [Father's] and/or liquidate property to pay off debt." Additionally, the court noted that "there are a lot of values that are not known as to specific properties,

5

exact debt amounts and uncertain dates of acquisition as the parties failed to provide documented evidence on these issues." Because of this failure to produce evidence of value, the court:

> "was required to rely on the parties stipulated exhibits with estimated values for some properties, some deeds to property that has been signed over to various parties with an unclear history of the transactions and oral testimony based on the parties' 'best guesses' for lack of a better term. Given these facts, the [c]ourt acknowledges that the actual final net worth of the parties may not be as far apart as it appears in the [c]ourt's division."

Then, trying to do what was right, the court ordered Mother to make "reasonable efforts to refinance all of the debt set over to her in the property and debt division set forth in this order into her individual name and remove [Father's] name from all said debts within ninety (90) days." If, however, Mother is unable to refinance the debts into her name with Father's name removed within 90 days, then Mother is ordered to pay Father $18,984.25 as an equity payment.

The court specifically held that the order:

> "[was] based on the age of the parties; the duration of the marriage; the property owned by the parties; their present and future earning capacity; the time, source and manner of acquisition of property; family ties and obligations associated with the items of property and debt and all other relevant factors in this matter."

Mother appeals the trial court's custody and property division orders, claiming primarily that the court ignored all the statutory factors in making its decisions. We will first take up the division of debts and assets.

*The rules that guide us are simple.*

When an appellate court is asked to review a district court's property division ruling, the standard for review is abuse of discretion. *In re Marriage of Wherrell*, 274 Kan. 984, 986, 58 P.3d 734 (2002). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *In re Spradling*, 315 Kan. 552, 590, 509 P.3d 483 (2022). The party asserting the district court abused its discretion bears the burden of showing such abuse of discretion. *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 466, 509 P.3d 1211 (2022). These rules require Mother to show that the court abused its discretion if she is to receive any relief from the trial court's judgments.

*We will not make arguments for a party.*

Regarding the first issue—the property and debt division—we note no real argument by Mother in her brief. She merely lists the 12 subsections of K.S.A. 23-2802(c) and asserts the court disregarded them. She offers no further explanation about any error or omission by the trial court. Nor does she point to any violation of any subsection of the law that forms the basis of this appeal. Frankly, Mother simply offers no further argument on the subject. Assertions are not substitutes for valid logical arguments.

Primarily, Mother complains about the trial court stating that it was making an estimated guess about the value of some of their property. She then asserts that the decision cannot be fair, just, and equitable since it was based on mere guesses. This bald assertion without further argument is not persuasive. How were the estimates wrong? Which estimates are incorrect and why? What is the correct amount?

Our review of the record reveals that the trial court exercised its equitable powers in an effective and innovative way. Instead of just dividing assets, the court tried to reallocate debt. Most of the marital assets ($125,787) were awarded to Mother while Father received less ($8,500). The parties did not complain about this apparent disparity.

The trial court found that based on Mother's award of several pieces of real estate and Father's testimony and evidence on the debts acquired during the divorce proceedings, an equity payment was necessary. But because Father requested no monetary equity payment, the court ordered instead that Mother take Father's name off the debt and refinance the debt in her name alone. The court relied on the testimony and evidence presented at trial in addition to the relevant statutory factors listed in the written order.

The court addressed the listed factors: parties' age; duration of the marriage; the parties' property; their present and future earning capacity; the time, source, and manner of acquisition of property; family ties and obligations associated with the items of property and debt and all other relevant factors. All these are factors found in K.S.A. 23-2802(c).

The trial court's property and debt division order was proper, given the application of the statutory factors and the reliance on the testimony and evidence in particular. Father's testimony about the debt taken out in his name without his knowledge or consent as well as his request that his name be taken off the debt in lieu of a monetary equity payment is not unreasonable. In addition, the court took careful consideration to divide both the property and debts that would be the fairest to both parties. The disproportionate values in net worth after the division of property and debt left Father with an unfair division. The court's order that Mother refinance her debt in her name only was an attempt to create a fair balance of property and debt for both parties. We find no reversible error here. We find no abuse of discretion.

*Is the joint custody order right and fair?*

Mother appeals the trial court's order granting joint legal custody with shared residential time, arguing the court skipped some statutory factors and did not properly weigh all the evidence presented at trial. She also suggests that the court did not properly consider all of the statutory factors in making its decision.

Custody decisions are exercises of judicial discretion. The trial court is in the best position to make the custody determination. Without any abuse of sound judicial discretion, the trial court's judgment will stand. Appellate courts review a trial court's decision about the child's custody, residency, visitation, or parenting time under K.S.A. 23-3201 et seq. for an abuse of discretion. See *Cheney v. Poore*, 301 Kan. 120, 128, 339 P.3d 1220 (2014).

*The statutory factors guiding custody determinations.*

The Family Law Code lists 18 factors to aid a trial court's determination of legal custody, residency, and parenting time for children. Those factors consider the history of the family, the parents' ability, and the relationship of the parents with the child. See K.S.A. 23-3203(a). These factors are not exhaustive, however, and a trial court may consider any other relevant fact in reaching a child custody determination. K.S.A. 23-3203(a).

*The trial court properly applied the statutory factors.*

At the end of evidence, the trial court discussed each factor found in K.S.A. 23-3203(a). After applying the factors to the facts presented at trial, the court concluded that joint legal custody with shared residential time was in the best interests of H.P. We briefly review the findings and note that the court weighed each point found in the law.

9

*Factors one through three did not weigh in favor of either parent.*

The trial court found the first three factors—(1) each parent's role and involvement with the child before and after separation; (2) the desires of the child's parents; and (3) the desires of a child of sufficient age and maturity—did not weigh in favor of either parent. The court concluded that the first factor was "pretty neutral." The court noted that before the separation, "third parties did an awful lot of care for" their child, because the parties were working. The second factor was also neutral because both parents wanted custody and residency of H.P. And the third factor did not apply because H.P. was not of sufficient age and maturity, as he was only six years old.

*Factors four and five evidenced the need for H.P. to have a consistent routine and thus neither factor weighed in favor of either parent.*

Factors four and five—the age of the child and the emotional and physical needs of the child—did not weigh in favor of either parent. The trial court noted that the parties' son was six years old and, because he is autistic, he requires "more consistency." The court noted the impossibility of creating a perfectly consistent parenting plan and the responsibility was on the parents to "get a consistent routine, a consistent plan." The court impressed upon the parties the importance of learning to communicate and freely share information with the other parent.

Thus, these factors did not weigh in favor of either parent because both parents struggled to communicate and maintain a consistent routine for H.P.

*Factors six and seven did not weigh in favor of either parent and established that H.P. should remain in the community and school district in Ashland, Kansas.*

The trial court found that factor six—the interaction and interrelationship of the child with parents, siblings, and any other person who significantly affects the child's best interests—did not weigh in favor of either parent. The court noted that neither parent was adept at forming relationships. It would not help their child if they did not try to do better communicating and allowing for positive relationships with the other parent and siblings.

Under factor seven—the child's adjustment to home, school, and community—the court found that H.P. should remain in the community and school district in Ashland, Kansas. The trial court noted that no evidence revealed the child was not "thriving in the Ashland school district" nor was there any indication that "he's not as adjusted as he can be, that he is—he's doing well, clearly from the IEP information, although [the court had] not actually seen his IEP."

Both parents testified that the school was aware of their son's issues and the things that he needed help or improvement on. The court concluded that H.P. was "doing well and [that] he's in an environment that is helping to try and facilitate his learning as best as they can be."

Thus, the trial court did not find any benefit "in removing him from the current school that he is in."

*Factors 8 and 10 did not weigh in favor of either parent because neither of them could communicate nor cooperate effectively.*

Under factor eight—the willingness and ability of each parent to respect and appreciate the bond between the child and the other parent—the trial court found both

11

parents were "pretty poor" at this and that neither parent wanted "to really acknowledge that that relationship with the other parent is important to [H.P.]." The court concluded that this factor did not weigh heavily in either parent's favor.

Under factor 10—the ability of the parties to communicate, cooperate, and manage parental duties—the trial court concluded that neither party could communicate or cooperate effectively. To aid the parents' relationship in the interest of their son, the court suggested that the parties send a notebook back and forth between their households documenting important events, such as upcoming doctors' appointments or triggering events that caused H.P. to meltdown.

Because the trial court found that both parents displayed issues communicating and cooperating with each other, this factor did not weigh in favor of either parent.

*Factor nine did not weigh in favor of either parent because the evidence did not compel a finding of domestic abuse.*

Factor nine was contested at trial by both parents. Mother testified that she felt threatened to dismiss a prior petition for divorce because Father became very angry, and she felt that he was threatening her life and her children's lives. She also testified that she filed three protection from abuse petitions but ultimately dismissed them. She claimed that she dismissed the petitions because she felt threatened by Father.

The court first noted that Mother presented a lot of information that she believed her relationship with Father had been abusive. And the court agreed that their relationship was not healthy. But, the court found no evidence that there was a "great degree of physical harm being caused by violence." The court noted that both parents let their anger escalate, leading to physical altercations between the two.

12

The court looked beyond the testimony of the parties in considering this point. Because the sheriff did not identify any domestic violence or abusive events that happened between the parties, the sheriff's testimony at trial proved particularly persuasive to the court. The events he did testify to were "not necessarily that kind of abuse where it's being harmful causing violent actions." Our review does not lead us to disagree with the trial court on this point.

The court observed that Mother had many opportunities to leave the relationship. She could have gone to Oklahoma as well as other places in Kansas. Mother certainly was not afraid to contact law enforcement officers as the record shows that she contacted law enforcement officers several times. The court then observed that Mother could have changed the dynamics of this relationship by following through any one of the cases she had filed.

The court then made several observations based on the testimony by both parents, noting that the evidence showed that protection from abuse petitions:

> "[were] a tool of manipulation that [Mother] used. Because again, numerous times you would file, you would dismiss. You would file, you would dismiss.
>    "The pictures that you put into evidence, I—I don't see abuse. I don't see evidence of your child being abused. So, I—there is no—there is nothing to support me being able to find that domestic violence or domestic abuse was occurring in this relationship.
>    "Mr. Pike, you have a temper. You have to find a way to control that temper. It is not okay to discipline your child in anger to the point where you are causing physical marks to be left on your child."

The trial court determined based on all the evidence and testimony presented that there was no evidence rising "to the level to support that there is anything of domestic

abuse that the Court can use as a major factor in making a decision." This factor, therefore, favors neither parent.

*Factors 11 through 14 did not weigh in favor of either parent.*

For factor 11—the school activity schedule of the child—the trial court found that nothing in the evidence suggested any concern about H.P.'s schooling. Thus, this factor was neutral.

For factor 12—the work schedule of the parties—the trial court noted that both parties had stable jobs and their schedules made a regular parenting plan feasible with H.P.'s schooling. Thus, this factor did not weigh in favor of either parent.

And for factors 13—the location of the parties' residence and places of employment—and 14—the location of the child's school—neither factor weighed in favor of either parent. Although Mother wanted to move back to Oklahoma, the trial court denied her request. The court's reasoning was that their son substantially resided in Ashland, Kansas, and that Ashland is "the community that the [parties] chose to make [their son's] home. [Their son] has family there." And the court noted that both parents and at least two of H.P.'s siblings lived in Ashland.

*Factors 15 through 18 were irrelevant to this custody determination.*

For the remaining factors, the trial court found that none of them applied. We agree.

Basically, the trial court found that both parents had their faults and criticized their performances as parents. The court's observations were guided by what is in the best interests of the child. We find no abuse of discretion here.

14

*Mother asks this court to reweigh evidence and substitute its judgment for that of the trial court.*

Mother argues the trial court misapplied the statutory factors, but the essence of her argument is that the trial court came to the wrong conclusion based on the evidence presented. Unless no reasonable judge would draw the same conclusion as the trial court, the trial court's decision will not be disturbed on appeal. Here, the evidence supports the trial court's decision that, applying the statutory factors in K.S.A. 23-3203 with the consideration for the best interests and welfare for H.P., joint legal custody with a shared residential custody was the correct decision. There was no abuse of discretion in the trial court's decision.

"While an appellate court has only the printed page to consider, the trial court has the advantage of seeing the witnesses and parties, observing their demeanor, and assessing the character of the parties and quality of their affection and feeling for the children." *Simmons v. Simmons*, 223 Kan. 639, 643, 576 P.2d 589 (1978). The trial court had that advantage and properly concluded that joint legal custody and shared residential custody was in the best interests of the minor child and the parties here.

We conclude by noting that the court's innovative approach of allocating debt rather than dividing assets seems reasonable here. It is not an abuse of discretion. Mother, having more marital property, is in a much better position to negotiate debt than Father is. The court's order concerning custody and its current parenting plan is workable. We will not substitute our judgment for that of the trial court. In our view, the trial court did what was right and fair under these circumstances.

Affirmed.